*In re* GREENE.

*(Circuit Court, S. D. Ohio, W. D.   August 4, 1892.)*

1. HABEAS CORPUS — PRISONER HELD FOR REMOVAL TO ANOTHER DISTRICT — INDICTMENT.
   On *habeas corpus* to release a person held under a warrant of a United States commissioner to await an order of the district judge for his removal to another district to answer an indictment, it is the right and duty of the circuit court to examine the indictment to ascertain whether it charges any offense against the United States, or whether the offense comes within the jurisdiction of the court in which the indictment is pending.

2. CRIMINAL LAW — OFFENSES AGAINST UNITED STATES — COMMON-LAW DEFINITIONS.
   There are no common-law offenses against the United States, and the offenses cognizable in the federal courts are only such as the federal statutes define, provide a punishment for, and confer jurisdiction to try; but when congress adopts or creates a common-law offense the courts may properly look to the common law for the true meaning and definition thereof, in the absence of a clear definition in the act creating it.

3. SAME — MONOPOLIES — INDICTMENT.
   Under the act of July 2, 1890, "to protect trade and commerce against unlawful restraints and monopolies," an indictment simply following the language of the statute would be wholly insufficient, for the words of the act do not themselves fully, directly, and clearly set forth all the elements necessary to constitute the offense; and the indictment must, therefore, be tested by the specific facts alleged to have been done or committed.

4. CONSTITUTIONAL LAW — INTERSTATE COMMERCE — MONOPOLIES.
   Congress has no authority, under the commerce clause or any other provision of the constitution, to limit the right of a corporation created by a state in the acqui-

sition, control, and disposition of property in the several states, and it is immaterial that such property, or the products thereof, may become the subjects of interstate commerce; and it is apparent that by the act of July 2, 1890, in relation to monopolies, congress did not intend to declare that the acquisition by a state corporation of so large a part of any species of property as to enable the owners to control the traffic therein among the several states, constituted a criminal offense.

5. MONOPOLIES—RESTRAINT OF TRADE.
To constitute the offense of "monopolizing, or attempting to monopolize," trade or commerce among the states, within the meaning of section 2 of said act, it is necessary to acquire, or attempt to acquire, an exclusive right in such commerce by means which will prevent others from engaging therein.

6. SAME—INDICTMENT.
In an indictment under section 1 of the act of July 2, 1890, to protect trade and commerce against monopolies, one count alleged, in substance, that on a specified date defendants, under the guise of the Distilling & Cattle Feeding Company, sold to certain persons in Boston a quantity of alcohol, then in Illinois, and that, by reason of the fact that said company controlled the manufacture and sale of 75 per cent. of all distillery products in the United States, defendants fixed the price at which the purchasers should and did sell such alcohol, and "did compel" said purchasers "to sell said alcohol at no less price than that fixed" by them, but there were no allegations as to the means of compulsion. Held, that it could not be assumed from these allegations that the means used was a contract with the purchasers, and the count was bad, as being too vague to charge any contract or restraint of trade between the states.

7. SAME—RESTRAINT OF TRADE—WHAT CONSTITUTES.
An arrangement whereby the said company promised persons who purchased from its distributing agents that if, for the ensuing six months, they would purchase their distillery products exclusively from such agents, and would not resell the same at prices less than those fixed by the company, then, on being furnished with a certificate of compliance therewith, it would pay a certain rebate on the amount of such purchases, did not constitute a contract in restraint of trade, within the meaning of section 1 of said act, since the purchaser was not in any way bound to the performance of the conditions named; nor did such arrangement operate to "monopolize," or "as an attempt to monopolize," trade and commerce, within the meaning of section 2 of said act.

8. SAME.
Nor was there any offense under the statute, even after the purchaser complied with the conditions of the promise, and thereby became entitled to the rebate, for such compliance had no retroactive effect to create a valid contract between the parties prior thereto.

9. SAME.
Even if the promise could be considered as a binding contract between the parties, the restraint thereby imposed was only partial and reasonable in the protection of defendant's business, and was not of the general character necessary to constitute an unlawful contract in restraint of trade. Mogul S. S. Co. v. McGregor, [1892] App. Cas. pt. 1, p. 25, approved.

10. SAME—INDICTMENT OF STOCKHOLDERS FOR ACTS OF CORPORATION.
In indictments of individuals under the said statute, where all the acts alleged to constitute the offense are charged to have been done by a corporation, an omission to state what relation defendants bore to the corporation, other than that of stockholders, is fatal, since mere stockholders cannot be held criminally responsible for the acts of the corporation.

At Law. Petition by Louis H. Greene for a writ of *habeas corpus* to release him from the custody of the United States marshal, by whom he is held under a warrant of a United States commissioner, awaiting an order for his removal to the district of Massachusetts to answer an indictment for an alleged violation of the act of July 2, 1890, relating to monopolies. Prisoner discharged.

*John W. Herron,* for the United States.
*Ramsey, Maxwell & Ramsey,* for Greene.

JACKSON, Circuit Judge. The petitioner, a citizen and resident of Ohio, having been arrested and taken into the custody of the United

States marshal of this district upon a warrant of a United States commissioner, here to await an order of the judge of the district court, under section 1014 of the Revised Statutes, for his removal to the district of Massachusetts for trial upon an indictment found and pending therein against him and others for alleged violations of the act of congress approved July 2, 1890, entitled "An act to protect trade and commerce against unlawful restraint and monopolies," has applied to this court to be discharged from such custody, claiming that he is illegally restrained of his liberty; that said indictment against him in the district court of Massachusetts, on which his arrest and confinement is solely based, charges him with no offense against the United States under said act of July 2, 1890; and that said district court has no jurisdiction over either his person or the alleged offense on which it is sought to remove him there for trial.

It admits of no question that it is both the right and duty of this court, upon this application, to consider and determine whether the indictment pending against the petitioner in the district of Massachusetts charges either a criminal offense or one that comes within the jurisdiction of that court. It is well settled that upon application for an order of removal under section 1014, Rev. St., the district court or judge may properly look into the indictment to ascertain whether an offense against the United States is charged, and whether the court to which the accused is sought to be removed has jurisdiction of the same. In such cases the judge exercises something more than a mere ministerial function, involving no judicial discretion. The liberty of the citizen, and his general right to be tried in a tribunal or forum of his domicile, imposes upon the judge the duty of considering and passing upon those questions. Such has been the uniform practice of the federal courts. *In re Buell*, 3 Dill. 116; *In re Doig*, 4 Fed. Rep. 193; *U. S.* v. *Brawner*, 7 Fed. Rep. 86; *U. S.* v. *Rogers*, 23 Fed. Rep. 658; *U. S.* v. *Fowkes*, 49 Fed. Rep. 50; *Horner* v. *U. S.*, 143 U. S. 207, 12 Sup. Ct. Rep. 407. These cases have recently been followed and approved by Judge RICKS in the case of *In re Corning*, (*U. S.* v. *Greenhut*,) 51 Fed. Rep. 205, and by Judge LACOMBE in *Re Terrell*, (*U. S.* v. *Greenhut*,) 51 Fed. Rep. 213, upon removal proceedings under the same, or substantially the same, indictment as that pending against petitioner. In the *Terrell Case*, Judge LACOMBE properly states that the same right and duty of looking into the indictment arises upon *habeas corpus*, whether the petitioner is held under the warrant of removal issued by the district judge, whose decision is thus reviewed, or under the warrant of the commissioner, to await the action of the district judge.

It is insisted by the district attorney, on behalf of the United States, that if the indictment is insufficient it must be met by a motion to quash, or some other appropriate proceeding in the court in which it is pending, and whose action would be subject to review; and the case of *In re Lancaster*, 137 U. S. 393, 11 Sup. Ct. Rep. 117, is relied on to support his contention that under *habeas corpus* proceedings the sufficiency of the indictment should not be inquired into. We do not understand that

decision as laying down any such general proposition as claimed for it in cases like the present. In that case the petitioners, being in the custody of the United States marshal under an indictment pending against them in the circuit court for the southern district of Georgia, applied to the supreme court for leave to file in said court their petition for a writ of *habeas corpus*, upon the grounds that the matters and things set forth and charged against them in the indictment did not constitute any offense under the laws of the United States, or cognizable in the circuit court. "In this posture of the case," say the supreme court, "we must decline to interfere." In this case it appears that the circuit court in which the indictment was pending had taken jurisdiction, and had the petitioners by its direction in the custody of its marshal, and no reason was shown for not invoking the judgment of said court upon the sufficiency of the indictment. The supreme court, in declining to interfere, acted in accordance with its well-settled rule not to issue or grant a writ of *habeas corpus* in the exercise of its original jurisdiction, except when the inferior court is acting without jurisdiction, or is exceeding its power to the prejudice of the party seeking relief. *In re Lane*, 135 U. S. 446, 10 Sup. Ct. Rep. 760; *Ex parte Mirzan*, 119 U. S. 584–586, 7 Sup. Ct. Rep. 341. It certainly did not intend to lay down the proposition that no other court than that in which an indictment was pending could look into the sufficiency of such indictment, or pass upon the question whether it charged an offense, or was within the proper jurisdiction of such court; for in the more recent case of *Horner* v. *U. S.*, 143 U. S. 214, 12 Sup. Ct. Rep. 410, it is said:

"The district judge, in exercising his jurisdiction under section 1014, Rev. St., to issue a warrant for the removal of Horner to the southern district of Illinois, had a right to determine whether or not the offense was within the jurisdiction of the district court of the United States for that district, and that determination was reviewable by *habeas corpus*."

In the second case of *Horner* v. *U. S.*, 143 U. S. 570, 12 Sup. Ct. Rep. 522, no question of removal to another district was involved, nor had any indictment been found; but the petitioner was simply held to await the action of the grand jury, and prematurely sought to raise, by *habeas corpus* proceedings, the question under examination, whether any offense had been committed. The present proceeding is essentially different, and comes within the rule stated above by Judge LACOMBE. If the indictment shows no offense committed against the United States in Massachusetts, the petitioner is unlawfully and illegally restrained of his liberty in being held in custody to await an order for his removal to that district for trial, and is entitled to the same measure of relief as though the removal had been ordered by the district judge. The right of the government to have the petitioner tried in the district of Massachusetts where the indictment is pending is not questioned if the case against him comes under section 731 of the Revised Statutes, providing that, "when any offense against the United States is begun in one judicial circuit, and completed in another, it shall be deemed to have been committed in either, and may be dealt with, inquired of, tried, deter-

mined, and punished in either district in the same manner as if it had been actually and wholly committed therein." There is, however, nothing in this provision of the law which deprives the court of the right and duty to look into the indictment to determine whether any offense against the United States is charged, and, if so, whether it was either begun or completed in the district of Massachusetts, so as to give the federal court there jurisdiction of the case. If, in cases like the present, the mere pendency of an indictment against a party in a state other than that of his domicile should be held to preclude all inquiry into the question whether he is charged with any offense against the United States, or whether the court wherein such indictment is pending has jurisdiction to try the accused, the rights of the citizen would be open to serious abuse. We are clearly of the opinion that the authorities establish a different rule, and we therefore proceed to the consideration of the indictment against the petitioner, to ascertain if any offense is charged against him, and, if so, whether the district court of Massachusetts has any jurisdiction in the premises.

The indictment is based upon alleged violations of sections 1 and 2 of the act of July 2, 1890, which read as follows:

"Section 1. Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states or with foreign nations, is hereby declared to be illegal. Every person who shall make such contract, or engage in any such combination or conspiracy, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding five thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court. Sec. 2. Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons to monopolize, any part of the trade or commerce among the several states, or with foreign nations, shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by fine not exceeding five thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court."

The indictment contains four counts. The 1st, 3d, and 4th allege violation of section 1, and the 2d count charges a violation of section 2. The 1st, 2d, and 3d counts recite, in the same general way, that on the 11th day of February, 1890, the petitioner and other associates, in the states of Ohio, Illinois, and New York, engaged with each other in a combination, in restraint of trade and commerce, in distillery products; that, for the purpose of restraining trade and commerce in said products among the several states of the United States, they, in the form and guise of a corporation known and designated as the Distilling & Cattle Feeding Company, which was on said 11th day of February, 1890, organized under the laws of Illinois, thereafter, and prior to August 1, 1890, obtained control, by purchase, renting, and leasing, 70 other distilleries within the United States used for the manufacture of said distilling products, which products were on February 11, 1899, and continuously thereafter, up to the finding of the indictment, "a subject of trade and commerce among the several states of the said United States;" that each of said distilleries were, at the respective dates of their pur-

chase, renting, or leasing and running under said control, separate and distinct, and competing in the manufacture and sale of distilling products among the several states; that, in pursuance of said combination, they used, managed, and controlled all said distilleries, and by means thereof did, during the period last mentioned, manufacture and sell, and control the manufacture and sale, within the United States, of 77,-000,000 gallons of said distillery products, said quantity being 75 per cent. of all the distillery products made and sold within and among the United States during said period; that the condition of trade and commerce in said products among the several states during said period was such that, by controlling the manufacture and sale of 75 per cent. of said distillery products, they were able to control and fix the price at which they would sell such products to dealers therein in the several states, and to control and fix the price at which such dealers should sell the same to citizens of the several states during said period; that by said means they intended to control the amount of said distillery products manufactured and sold among the several states, and to control and fix the price at which said distillery products should be sold by all dealers therein among the several states, and in the state of Massachusetts, and to prevent and counteract the effect of free competition in the usual price at which said products were sold among and within the several states, and to increase and augment the usual price thereof, and thereby exact and procure great sums of money from the citizens of Massachusetts and other states purchasing distillery products, and to secure to themselves exclusively the trade and commerce in said distillery products, and by all the means aforesaid unlawfully to restrain the trade and commerce in such products among the several states of the United States.

The first count then alleges that, in pursuance of said purpose and intent, they, under the form and guise of said Distilling & Cattle Feeding Company, on October 3, 1890, did at Boston, within the district of Massachusetts, "negotiate a sale, and did sell," to the firm of D. T. Mills & Co., 5,642.82 proof gallons of alcohol, which was then in the state of Illinois; that by reason of said combination, and of their control of the large number of distilleries and the manufacture of 75 per cent. of all such products in the United States, they did fix the price at which said D. T. Mills & Co., who were dealers therein at Boston, should and did sell said alcohol within said district of Massachusetts, or for transportation into any other state, "and did compel said Mills & Co. to sell said alcohol within said district of Massachusetts for use in said district, or for transportation to other states of the United States, at no less price than that fixed" by the accused; that by this means they controlled the amount of distilled products sold within the state of Massachusetts, and did fix the price at which said products were sold by dealers in said state; that they thereby prevented and counteracted the effect of free competition on the usual price at which said products were sold within the state, and did increase and augment the usual price at which said distillery products were sold in the state of Massachusetts for use therein or transportation therefrom, and that they thereby, and by the means aforesaid, did "re-

strain the trade and commerce in said distilling products between the state of Massachusetts and the states of the said United States other than the state of Massachusetts," contrary to the form of the statutes in such case made and provided.

The second count, based upon the second section of the act, after the aforesaid general recital, charges an unlawful attempt to monopolize the trade and commerce in distillery products under the form and guise of said Distilling & Cattle Feeding Company; and the specific acts therein alleged are that on September 18, 1890, C. I. Hood, of Lowell, Mass., purchased from Webb & Harrison, as distributing agents of the accused, 526.52 proof gallons of alcohol; that the defendant, in the form and guise of the aforesaid company, promised said Hood a rebate of five cents per gallon on the purchase price of said alcohol, upon condition that for six months from the date of the promise he should have bought his supply or supplies of distillery products exclusively from said company's agents, and should not have sold any of the products so purchased at less than the company's distributing agents' list prices, and should furnish evidence of compliance with those conditions in the form of a certificate. This count alleges a similar arrangement with Kelly and Durkee on the sale to them, September 23, 1890, by the company's distributing agents, of 85.54 proof gallons of alcohol. It also sets out a list of the distributing agents from whom purchases could be made, and the agreement of the company as to the five cents per gallon rebate, and the condition on which it would be made. It is alleged that, by means of said premises and terms of rebate to said purchasers, the accused, under the form and guise aforesaid, did attempt to monopolize to themselves the trade and commerce in said distillery products among the several states, in violation of law.

The third count is based upon the first section of the act. It alleges an agreement made by the aforesaid company with C. I. Hood, at Lowell, Mass., on the sale to him of 518.88 gallons of said company's products, made October 2, 1890, for a rebate upon the same terms and conditions as set forth in the second count, by which arrangement and promise it is charged that the accused "did attempt to execute and carry out the purpose and intent aforesaid to restrain the trade and commerce in said distillery products among the several states of the said United States, and especially between the state of Massachusetts and other states of the United States, against the peace," etc.

The fourth count is also founded upon section 1 of the act. It sets out a contract or agreement of the Distilling & Cattle Feeding Company with Kelly and Durkee, bearing date at Peoria, Ill., September 23, 1891, promising to pay the latter $4.27 as a rebate of 5 cents per gallon on 85.54 proof gallons of the company products purchased that day, upon the same terms and conditions as alleged in the second and third counts; and then sets forth the certificate of said Kelly and Durkee that they had since the date of the agreement purchased all their supply of such goods as are produced by the Distilling & Cattle Feeding Company, exclusively from one or more of the dealers or distributing agents of the company,

of which a list is attached. This certificate bears date May 7, 1892, and it is charged that the purchaser's compliance with the terms and conditions on which the company promised to make or pay the 5 cents per gallon on rebate was a contract in restraint of trade and commerce, within the provisions of the statute.

In the consideration of this indictment it should be borne in mind that there are no common-law offenses against the United States; that the federal courts cannot resort to the common law as a source of criminal jurisdiction; that crimes and offenses, cognizable under the authority of the United States, are such, and only such, as are expressly designated by law; and that congress must define these crimes, fix their punishment, and confer the jurisdiction to try them. *U. S.* v. *Hudson*, 7 Cranch, 32; *U. S.* v. *Coolidge*, 1 Wheat. 415; *U. S.* v. *Britton*, 108 U. S. 199–206, 2 Sup. Ct. Rep. 531.

When congress, under and in the exercise of powers conferred by the constitution, adopts or creates common-law offenses, the courts may properly look to that body of jurisprudence for the true meaning and definition of such crimes, if they are not clearly defined in the act creating them. *U. S.* v. *Armstrong*, 2 Curt. 446; *U. S.* v. *Coppersmith*, 4 Fed. Rep. 198. The act of July 2, 1890, on which the present indictment is based, in declaring that contracts, combinations, and conspiracies in restraint of trade and commerce between the states and foreign countries were not only illegal, but should constitute criminal offenses against the United States, goes a step beyond the common law, in this: that contracts in restraint of trade, while unlawful, were not misdemeanors or indictable at common law. It adopts the common law in making combinations and conspiracies in restraint of the designated trade and commerce criminal offenses, and creates a new crime, in making contracts in restraint of trade misdemeanors, and indictable as such. But the act does not undertake to define what constitutes a contract, combination, or conspiracy in restraint of trade, and recourse must therefore be had to the common law for the proper definition of these general terms, and to ascertain whether the acts charged come within the statute. We regard it as well settled by the authorities that an indictment, following simply the language of the act, would be wholly insufficient, for the reason that the words of the statute do not of themselves fully, directly, and clearly set forth all the elements necessary to constitute the offense intended to be punished. *U. S.* v. *Cruikshank*, 92 U. S. 542; *U. S.* v. *Simmonds*, 96 U. S. 360; *U. S.* v. *Carll*, 105 U. S. 611; *U. S.* v. *Britton*, 107 U. S. 655, 2 Sup. Ct. Rep. 512; *U. S.* v. *Trumbull*, 46 Fed. Rep. 755.

Under the principle established by those cases, the several counts of the present indictment must be tested, not by the general recitals and averments thereof, although in the words of the statutes, but by the specific acts or particular facts, which are alleged to have been actually done and committed by the accused. If the particular acts or facts charged do not, as a matter of law, constitute contracts, combinations, or conspiracies in restraint of trade and commerce among the several

states, or a monopoly or attempt to monopolize any part of such trade or commerce, no amount of averments and allegations that the accused "engaged in a combination," or "made contracts in restraint" of such trade or commerce, or "monopolized" or "attempted to monopolize" the same, will avail to sustain the indictment. Whether the accused is charged with an offense is to be determined by the particular acts or facts set forth, and not by the conclusions of the pleader, although asserted in the words of the statute: "Every offense consists of certain acts done or omitted under certain circumstances, and in the indictment for the offense it is not sufficient to charge the accused generally with having committed the offense, but all the circumstances constituting the offense must be specially set forth." *U. S.* v. *Cruikshank,* 92 U. S. 542, 563.

Do the particular facts set forth in the indictment constitute violation of the statute? In construing and applying the provisions of the act to the specific offenses charged, it must be assumed that congress did not intend to make the enactment either retroactive or give it an *ex post facto* operation and effect. No criminality can therefore be ascribed to the acts of the accused in respect to their recited combination on February 11, 1890, in restraint of trade and commerce in distillery products by means of the Distilling & Cattle Feeding Company, a corporation organized by them on that day under the laws of Illinois, and its acquisition and control prior to the passage of the act of July 2, 1890, of 70 other distilleries, which enabled said company to manufacture and sell 70,-000,000 gallons of said distillery products, said quantity being 75 per cent. of all the distillery products manufactured and sold in the United States between the date or dates of acquiring said distilleries and the finding of the indictment. It is not alleged that this acquisition and control of the 70 other distilleries by the accused or by the Distilling & Cattle Feeding Company, by means of which this large production was secured, was in any respect unlawful; nor is it alleged, or even recited, that the parties from whom said 70 other distilleries were acquired, were by contract restrained from thereafter engaging in the distillery business, either generally or partially. From anything averred or recited to the contrary, it must be presumed, in this proceeding, that the defendants, or the Distilling & Cattle Feeding Company, in whose form and guise the accused is said to have acted, were in the rightful possession and control of the numerous distilleries employed by them in the manufacture of distilled products; and the quantity of such products, whether large or small, can in no way affect the right of disposition incident to lawful ownership. Congress may place restriction and limitations upon the right of corporations created and organized under its authority to acquire, use, and dispose of property. It may also impose such restrictions and limitations upon the citizen in respect to the exercise of a public privilege or franchise conferred by the United States. But congress certainly has not the power or authority under the commerce clause, or any other provision of the constitution, to limit and restrict the right of corporations created by the states, or the citi-

zens of the states, in the acquisition, control, and disposition of property. Neither can congress regulate or prescribe the price or prices at which such property, or the products thereof, shall be sold by the owner or owners, whether corporations or individuals. It is equally clear that congress has no jurisdiction over, and cannot make criminal, the aims, purposes, and intentions of persons in the acquisition and control of property, which the states of their residence or creation sanction and permit. It is not material that such property, or the products thereof, may become the subject of trade or commerce among the several states or with foreign nations. Commerce among the states, within the exclusive regulating power of congress, " consists of intercourse and traffic between their citizens, and includes the transportation of persons and property, as well as the purchase, sale, and exchange of commodities." *County of Mobile* v. *Kimball*, 102 U. S. 691–702; *Gloucester Ferry Co.* v. *Pennsylvania*, 114 U. S. 203, 5 Sup. Ct. Rep. 826. In the application of this comprehensive definition, it is settled by the decisions of the supreme court that such commerce includes, not only the actual transportation of commodities and persons between the states, but also the instrumentalities and processes of such transportation. That it includes all the negotiations and contracts which have for their object, or involve as an element thereof, such transmission or passage from one state to another. That such commerce begins, and the regulating power of congress attaches, when the commodity or thing traded in commences its transportation from the state of its production or *situs* to some other state or foreign country, and terminates when the transportation is completed, and the property has become a part of the general mass of the property in the state of its destination. When the commerce begins is determined, not by the character of the commodity, nor by the intention of the owner to transfer it to another state for sale, nor by his preparation of it for transportation, but by its actual delivery to a common carrier for transportation, or the actual commencement of its transfer to another state. At that time the power and regulating authority of the states ceases, and that of congress attaches and continues, until it has reached another state, and become mingled with the general mass of property in the latter state. That neither the production or manufacture of articles or commodities which constitute subjects of commerce, and which are intended for trade and traffic with citizens of other states, nor the preparation for their transportation from the state where produced or manufactured, priort o the commencement of the actual transfer, or transmission thereof to another state, constitutes that interstate commerce which comes within the regulating power of congress; and, further, that after the termination of the transportation of commodities or articles of traffic from one state to another, and the mingling or merging thereof in the general mass of property in the state of destination, the sale, distribution, and consumption thereof in the latter state forms no part of interstate commerce. *Pensacola Tel. Co.* v. *Western Union Tel. Co.*, 96 U. S. 1; *Brown* v. *Houston*, 114 U. S. 622, 5 Sup. Ct. Rep. 1091; *Coe* v. *Errol*, 116 U. S. 517–520, 6 Sup. Ct. Rep. 475; *Robbins*

v. *Taxing Dist.*, 120 U. S. 497, 7 Sup. Ct. Rep. 592; and *Kidd* v. *Pearson*, 128 U. S. 1, 9 Sup. Ct. Rep. 6.   In the latter case the supreme court pointed out the distinction between commerce and the subjects thereof, and held that the manufacture of distilled spirits, even though they were intended for export to other states, was not commerce, falling within the regulating powers of congress.

Stripping the indictment of its verbiage,—its general recitals and conclusions of law,—does either count thereof charge any real offense against the United States over which the district court of Massachusetts has jurisdiction?   The specific offense charged in the first count is that the defendants, under the form and guise of the Distilling & Cattle Feeding Company, sold on October 3, 1890, to Mills and Gaffield, copartners under the name of D. T. Mills & Co., a certain quantity of distilled products then in the state of Illinois; that, by reason of said Distilling & Cattle Feeding Company's controlling the manufacture and sale of 75 per cent. of all such products in the United States, they fixed the price at which said purchasers should and did sell said alcohol for use in Massachusetts, or for transportation into any other state, "and did compel said Mills and Gaffield, as copartners, to sell said alcohol at no less price than that fixed" by them.   It is not alleged how said Boston purchasers were "compelled" to sell at the prices fixed by the defendants, nor how, or under what arrangement, the defendants fixed the price at which the alcohol should be sold in Massachusetts, or for transportation therefrom. Was it one of the provisions of the contract of sale and purchase, or was it by a combination or conspiracy between the defendants and the Boston purchasers?   The means described by which the defendants were enabled to fix the price at which the purchasers should sell the alcohol was certainly not a "contract, combination, or conspiracy in restraint of trade and commerce among the states."   If they, by force or duress, "compelled" the purchasers to sell at a price fixed by them, such compulsion would not constitute either a contract, combination, or conspiracy in restraint of trade.   It cannot be assumed, under the language employed in this count, that there was any "contract" between the defendants and Mills and Gaffield which by its terms and provisions restrained the latter in respect to to the price at which they should or did sell the alcohol.   The count certainly charges no "combination or conspiracy," within the meaning of the act, between the defendants and the Boston purchasers.   The charge is too vague and general to show a "contract" in restraint of trade, such as the first section of the act contemplates and declares illegal.   It cannot be aided by presumption or intendments. It is bad upon its face, and charges no offense committed in the state of Massachusetts of which the United States courts in that state could take jurisdiction.

The second count charges an attempt on the part of defendants to monopolize to themselves, under the form and guise of said Distilling & Cattle Feeding Company, the trade and commerce in distillery products among the several states, and between the state of Massachusetts and other states; the special acts on which this charge is based being that,

on the purchase of certain quantities of alcohol by C. I. Hood, and Kelly & Durkee, (citizens and residents of Massachusetts,) in September, 1890, from certain distributing agents of the Distilling & Cattle Feeding Company, the defendants, under the form and guise of said company, agreed and promised that if said purchasers would, for a certain designated period, (six months,) buy all their supply or supplies of distillery products exclusively from said company's distributing agents, (two of whom, as appears in the count, were located at Boston, Mass.,) and would not sell the alcohol or other distillery products so purchased at any lower prices than the list prices of such distributing agents, and would make a proper certificate of such facts, then the said Distilling & Cattle Feeding Company would make and pay to said purchasers a rebate of five cents per gallon on each gallon purchased by them. The third and fourth counts set out substantially the same arrangement and agreement as to the payment of a rebate of five cents per gallon upon the purchasers' compliance, during the period stated, with the aforesaid terms and conditions, and charge the same to have been contracts in restraint of trade and commerce among the states, within the purview of the statute. We may therefore consider those three counts together. Do the facts therein set forth constitute either an "attempt to monopolize" trade and commerce in distillery products among the states, or contracts in restraint of such trade? It is not very clear what congress meant by the second section of the act of July 2, 1890, in declaring it a misdemeanor to "monopolize," or "attempt to monopolize," any part of the trade or commerce among the states or with foreign nations. It is very certain that congress could not, and did not, by this enactment, attempt to prescribe limits to the acquisition, either by the private citizen or state corporation, of property which might become the subject of interstate commerce, or declare that, when the accumulation or control of property by legitimate means and lawful methods reached such magnitude or proportions as enabled the owner or owners to control the traffic therein, or any part thereof, among the states, a criminal offense was committed by such owner or owners. All persons, individually or in corporate organizations, carrying on business avocations and enterprises involving the purchase, sale, or exchange of articles, or the production and manufacture of commodities, which form the subjects of commerce, will, in a popular sense, monopolize both state and interstate traffic in such articles or commodities just in proportion as the owner's business is increased, enlarged, and developed. But the magnitude of a party's business, production, or manufacture, with the incidental and indirect powers thereby acquired, and with the purpose of regulating prices and controlling interstate traffic in the articles or commodities forming the subject of such business, production, or manufacture, is not the monopoly, or attempt to monopolize, which the statute condemns.

A "monopoly," in the prohibited sense, involves the element of an exclusive privilege or grant which restrained others from the exercise of a right or liberty which they had before the monopoly was secured. In commercial law, it is the abuse of free commerce, by which one or more

individuals have procured the advantage of selling alone or exclusively all of a particular kind of merchandise or commodity to the detriment of the public.   As defined by Blackstone, (4 Bl. Comm. 159,) and by Lord Coke, (3 Co. Inst. 181,) it is a grant from the sovereign power of the state by commission, letters patent, or otherwise, to any person or corporation, by which the exclusive right of buying, selling, making, working, or using anything is given.   When this section of the act was under consideration in the senate, distinguished members of its judiciary committee and lawyers of great ability explained what they understood the term "monopoly" to mean; one of them saying: "It is the sole engrossing to a man's self by means which prevent other men from engaging in fair competition with him."   Another senator defined the term in the language of Webster's Dictionary: "To engross or obtain, by any means, the exclusive right of, especially the right of trading, to any place or with any country, or district; as to monopolize the India or Levant trade."   It will be noticed that, in all the foregoing definitions of "monopoly," there is embraced two leading elements, viz., an exclusive right or privilege, on the one side, and a restriction or restraint on the other, which will operate to prevent the exercise of a right or liberty open to the public before the monopoly was secured.   This being, as we think, the general meaning of the term, as employed in the second section of the statute, an "attempt to monopolize" any part of the trade or commerce among the states must be an attempt to secure or acquire an exclusive right in such trade or commerce by means which prevent or restrain others from engaging therein.   It was certainly not a "monopoly," in the legal sense of the term, for the accused or the Distilling & Cattle Feeding Company to own 70 distilleries, and the products thereof, whether such products amounted to the whole or a large part of what was produced in the country.   Their ownership and control of such products, as subjects of trade and commerce, is not what the statute condemns, but the monopoly or attempt to monopolize the interstate trade or commerce therein.   In this acquisition and operation of the 70 distilleries, which enabled the accused or said Distilling & Cattle Feeding Company to manufacture and control the sale of 75 per cent. of the distillery products of the country, it does not appear, nor is it alleged, that the persons from whom said distilleries were acquired were placed under any restraint, by contract or otherwise, which prevented them from continuing or re-engaging in such business.   All other persons who chose to engage therein were at liberty to do so.   The effort to control the production and manufacture of distillery products, by the enlargement and extension of business, was not an attempt to monopolize trade and commerce in such products within the meaning of the statute, and may therefore be left out of further consideration.

Was the arrangement with the Boston purchasers, as to making them a rebate upon the conditions stated, an attempt to monopolize any part of the trade and commerce among the states in distillery products?   It is not alleged, nor is it to be inferred from anything that is set forth, that said purchasers bound themselves, or entered into any contractual

obligations or understanding, to buy their distillery supplies exclusively from the distributing agents of said Distilling & Cattle Feeding Company. They were left at perfect liberty to purchase when, where, or from whom they pleased. No contractual or other restraint was placed upon them. Upon certain conditions, which it was entirely optional with them to comply with or disregard, a rebate was promised by the seller. Such an arrangement does not amount to a contract to purchase exclusively from said distilling company or its distributing agents. But, suppose it did, there was nothing in such an agreement unlawful or in contravention of the statute. The promise of a rebate, as an inducement for exclusive trading, certainly does not constitute an "attempt to monopolize," when the purchaser is left at liberty to buy where he pleases, and when all other sellers of the article are left unrestrained in offering the same, or greater, inducements. As to the remaining condition upon which the rebate was to be payable, the same observation may be made. The purchasers were placed under no contractual or other restraint in respect to the price at which they should sell. They were simply offered a rebate, as an inducement not to undersell the vendor's distributing agents, two of whom were located at Boston, Mass. The arrangement relied on, considered either in detail or as a whole, involved no "attempt to monopolize any part of the trade or commerce among the states." The rebate promised, upon condition of exclusive purchases and not underselling the vendor's distributing agents, was a legitimate method of inducing trade; but the means thus employed in no way operated to prevent or restrain others from offering the same, or greater, inducements. The condition as to not selling at lower prices than those of the distributing agents may have had a tendency to maintain prices, but that would not have been an attempt to monopolize trade. The inducements offered for the exclusive trade, and to sell at no lower prices than the price list of the distributing agents, was not prejudicial to the public. It was in no way contrary to public policy, or an unlawful restraint of trade, as will be seen from the authorities hereinafter referred to. But, aside from this, it is not shown that said arrangement necessarily involved or related to interstate traffic. It is not alleged that Webb & Harrison, the distributing agents, from whom Hood and Kelly and Durkee made their purchases of alcohol, were located or made such sales in some other state than Massachusetts; nor that the alcohol itself was beyond the limits of that state when purchased. Neither is it shown that the exclusive purchases thereafter to be made, as one of the conditions on which the rebate was to be paid, could not have been made in the state of Massachusetts, it appearing from the face of the count that two of such distributing agents were located at Boston, in said state. Without dwelling further upon its consideration, we are clearly of the opinion that this second count fails to charge any offense against the petitioner.

What has been already said applies largely to the third and fourth counts. The matter of the promised rebate upon the same conditions as set forth in the second count, which is charged to have been a con-

tract in restraint of trade and commerce among the states, and between the state of Massachusetts and other states, does not constitute any offense against the United States, or in any way contravene the first section of the act of July 2, 1890, because there was actually no contract which bound, or attempted to bind, the Massachusetts purchasers of alcohol, as to where or from whom they would make further purchases during the period stated, nor as to the price or prices at which they should sell. They were simply offered an inducement in respect to those matters, which they were at perfect liberty to comply with or decline. They were not restrained by any contractual obligation during the stipulated period. The agreement was wholly unilateral during that period. Upon compliance with the conditions as alleged in the fourth count, they were entitled to the rebate; but such compliance had no retroactive operation to create a valid and subsisting contract between the parties prior thereto, or during the period intervening between the date of the promise and the full compliance with the conditions on which the rebate was to be paid. During that period there was between the parties no contract in restraint of trade. But suppose the arrangement could by any possibility be construed into a contract between the parties from the date of the promise, or during the stipulated period, it could not be held to be a contract in restraint of trade. It is not deemed necessary to review the authorities upon the subject of contracts in restraint of trade, nor would it be at all profitable. It is well settled that contracts in general restraint of trade are contrary to public policy, and therefore unlawful. The arrangement under consideration cannot possibly be considered as one in general restraint of trade. Where the restraint is partial, either as to time or place, its validity is to be determined by its reasonableness and the existence of a consideration to support it. The question of its reasonableness depends on the consideration whether it is more injurious to the public than is required to afford a fair protection to the party in whose favor it is secured. No precise boundary can be laid down as to when, and under what circumstances, the restraint would be reasonable, and when it would be excessive. *Navigation Co.* v. *Winsor,* 20 Wall. 64–68; *Beal* v. *Chase,* 31 Mich. 490; *Ward* v. *Byrne,* 5 Mees. & W. 549; *Horner* v. *Graves,* 7 Bing. 735; *Mallan* v. *May,* 11 Mees. & W. 667; *Whittaker* v. *Howe,* 3 Beav. 383; *Hodge* v. *Sloan,* 107 N. Y. 244, 17 N. E. Rep. 335. In the present case, the arrangement treated as a contract was founded upon a valid consideration, and only secured to the vendors a reasonable protection in their business. It was not an unlawful contract in restraint of trade. The authorities fully support this conclusion. In addition to those referred to above, we cite the following: *Brown* v. *Rounsavell,* 78 Ill. 589; *Fowle* v. *Park,* 131 U. S. 88, 9 Sup. Ct. Rep. 658; *Chicago, etc., R. Co.* v. *Pullman South. Car Co.,* 139 U. S. 79, 11 Sup. Ct. Rep. 490; *Mogul S. S. Co.* v. *McGregor,* [1892] App. Cas. pt. 1, p. 25, (decided by the house of lords in December, 1891.) In this latter case there was a combination or association of ship owners who, being engaged in the trade with China, with a view of obtaining a monopoly of the homeward tea trade and ex-

cluding the plaintiffs from competing with them for the same, and thereby keep up freight, offered to rebate or repay every sixth month, to such merchants and shippers in China as should have shipped their tea exclusively in vessels of the association, 5 per cent. on all freight paid by them. The plaintiffs, as rival and competing ship owners, were thereby excluded from this business, and sued for damages, and the question (almost identical with that under consideration) was presented whether the combination and arrangement adopted by the association to secure the exclusive transportation of tea trade was in any way unlawful. It was first passed upon, and held to be free from objection, by Lord COLERIDGE. 21 Q. B. Div. 554, 4 Ry. & Corp. Law J. 611. His decision was sustained on appeal, (23 Q. B. Div. 598, 7 Ry. & Corp. Law J. 223,) and was finally affirmed by the house of lords. It would be highly instructive to quote at length from the opinions delivered in the house of lords, if the limits of this opinion permitted. The reasoning and conclusions there reached fully sustain our conclusions in the present case.

But there is another and fatal objection to all the counts of this indictment. All the acts and matters charged as criminal offenses were, as shown upon the face of the indictment, the acts of the Distilling & Cattle Feeding Company, a corporation organized under the laws of Illinois. It is not alleged what relation the accused bore to said corporation; nor does it appear whether their connection therewith was other than that of mere stockholders, except as to the defendant Greenhut. By the eighth section of the statute, it is provided "that the word 'person' or 'persons' wherever used in that act, shall be deemed to include corporations and associations existing under or authorized by the laws of either the United States, the laws of any of the territories, the laws of any state, or the laws of any foreign country." If the acts charged constitute criminal offenses, the Distilling & Cattle Feeding Company is the "person" who has committed the same. It would be unheard of in criminal jurisprudence to make its stockholders criminally responsible for the corporation's violation of the statute. That corporation can readily be reached and prosecuted by the government, either civilly or criminally, for what it may have done in contravention of the law, without requiring the courts, by strained construction of the statute, to extend its provisions and make them embrace all parties merely interested in such corporation. Except in conspiracy offenses, there is no criminality by representation. We have not deemed it necessary or proper to attempt the difficult task of defining the cases to which the statute will apply. The enactment was manifestly aimed at the trust combinations and associations formed by individuals and corporations, which the state courts have in most instances declared illegal. The conclusion of the court is that the petitioner, Lewis H. Greene, should be discharged, and it is accordingly so ordered and adjudged.