**UNITED STATES of America**

v.

**Evetts HALEY, Jr.**

**Civ. No. 7077.**

United States District Court
N. D. Texas,
Dallas Division.

Sept. 10, 1958.

John C. Ford, Asst. U. S. Atty., Dallas, Tex., Howard Rooney, Office of General Counsel Department of Agriculture, Washington, D. C., Hiram Childress, Regional Attorney Department of Agriculture, Dallas, Tex., for the Government.

William F. Billings, James P. Donovan, Dallas, Tex., Ernest E. Clulow, Jr., Tulsa, Okl., for defendant.

DAVIDSON, Chief Judge.

This case, in so far as dollars and cents are concerned, is of small moment, but it involves a question that affects millions of our citizenship. The whole agricultural industry of the nation is affected by this decision, if the Court sustains, or if the Court refuses. In other words, the ultimate decision and the ultimate action of our Government on the question here involved will determine the future of the agricultural population to a very large degree.

In this case the defendant has been sued, we might say prosecuted, for planting wheat. For planting wheat and for harvesting it and feeding it to his stock, the allegation is that he has, within the bounds of the Constitution, violated the Agricultural Act, 7 U.S.C.A. § 1621 et seq., and is due to be penalized in the sight of the law.

There is such a thing as allowing a time-honored practice, sentiment and feeling to go on for ages until it becomes part of the warp and woof of the people themselves.

Nineteen hundred years ago a man uttered these words, "I have a right to do as I will with mine own," and for nineteen hundred years that has been one of the pillars and fundamental belief and faith of our people.

You may scoff at the idea of Christian civilization, if you wish. You will find it expressed in 46 of the 48 Constitutions of the states of the Union; you will find it expressed in words like this, "Humbly invoking the help of Almighty God we do now ordain and establish this Constitution."

We have a people in favor of constitutional government. And on that supposition we have lived, starting with the declaration, "I have a right to do as I will with mine own."

I had never heard that questioned until about 1941 when one of our leading economists who was widely accepted at that time gave out a statement that when the World War was over we would not return to the former days of free enterprise and freedom of activity that we formerly had and enjoyed in the days of our fathers because, "We are now entering into a managerial revolution." It was discussed among the lawyers at the Bar meeting. I couldn't conceive of its really coming into effect, but when we hear the evidence in this case, when we hear the testimony of Mr. Benson, we realize that the managerial revolution is, in fact, here. A man cannot longer do as he pleases with his own.

We might, in addition, look to the father of free government, the father of Democracy, Thomas Jefferson, "Let every man, with the gift that God has given you, work out your own fortunes with a just government." A little further he

said, "The government that governs least governs best."

And in our own generation a great jurist, Judge Brandeis, of the United States Supreme Court, says that the inalienable right of man is to be let alone. Man in his efforts to make his fortune has a right to be let alone, unless he is interfering with somebody else.

Now, the law has been attacked by counsel for the defendant. It has been sustained by our higher courts. I hardly think, however, that the court that sustained this law had before it the record that has been made here, with its direful effect upon the public. They probably had no information of what the ballot was that was submitted to the farmers. And if you take into consideration that when this balloting takes place the farmer is made to know that he has a guarantee of a certain price if he cooperates and none if he does not. Suppose a different ballot, worded thus: "Do you as a farmer, favor the government supervision of production?" Then could you forecast the result? It is not a question of marketing; it is a question of whether production is unlawful and in violation of the Constitution.

There are some eighteen different things that the Constitution says Congress may or may not do. We might just casually look at some of those: It has a right to borrow money; a right to regulate commerce; make a treaty with foreign nations; a right to coin money; a right to establish post offices; a right to constitute inferior tribunals of the Supreme Court; a right to declare war, and provide maintenance to the navy, and in all about eighteen.

There is nothing in there that says Congress shall have the power to regulate production in agriculture. There is nothing in there that says you may levy an income tax. There is nothing in there that says you might enact national prohibition, but we did enact a constitutional amendment for each and did enact a law of national prohibition and one for income tax. We have as yet no constitutional amendment authorizing either the Congress or the Secretary of Agriculture, or the Department of Agriculture to tell the farmer what he may plant and what he may do in his farm work.

When the Constitution was adopted many objections were urged because there was not a Bill of Rights.

North Carolina adopted a most excellent Bill of Rights; Virginia adopted one not quite so lengthy; so did Rhode Island and others. Then it was referred to Congress and James Madison worked those things over and reported them and it was submitted to the people and ten of them were adopted. So they became immediately a part of the Constitution of the United States.

The Tenth Amendment says: "The powers not delegated to the United states by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

Now, it is said the Constitution authorized this law. If it authorizes it under anything it is under the 8th subsection of Article I which deals with commerce among the states. It is subsection 3 of Sec. 8—to regulate commerce with foreign nations and among the several states and with the Indian tribes.

So this legislation we now have before us is sought to be made constitutional under that provision.

Therefore, we are relegated immediately back to the word "commerce." Production is not commerce. It has been held in the years gone by, by our courts and it appears in almost every dictionary you consult, that production is not commerce. It may pass into commerce, but it is not commerce until it does. I am not changing my views; I am adhering to decisions I have heretofore rendered.

On one occasion we were called upon to determine whether the cotton that the cotton farmer still owned was in commerce; he put it in a warehouse and he hadn't sold it. We held it was not in

commerce, and was not until he sold it. The fact that it is production that could go into commerce is only a possibility and a contingency.

One of our former justices of the United States Court, Judge White who was Chief Justice about the time some of you older men were born, lived in Louisiana, and was one of the most eminent justices of our nation, says in the case of Hooper v. People of the State of California: "If the power to regulate interstate commerce applied to all incidents to which said commerce might give rise and to all contracts which might be made in the course of its transactions, that power would embrace the entire sphere of mercantile activity in any way connected with trade between the states, would exclude the states' control over many contracts that are purely domestic in nature." 155 U.S. 648–655, 15 S.Ct. 207, 210, 39 L.Ed. 297.

If this law is finally upheld, I think it should be definitely stated by our courts that intrastate commerce has been abolished and that the states have no control over even their domestic commerce.

Now, out of sixty million acres of land planted in wheat this defendant planted forty. I won't take a pencil and see what percentage it would be, but it would be a very small percentage. Well, you say it is small but we notice it because it is the far reaching principle involved. If it is unlawful for him to produce something on his 40 acres that *might* get into interstate commerce, then if a woman goes into her garden and gathers a gallon of beans, or, if it is red beans and a farmer gathers them out of his field and consumes them on his table maybe he has done something that affects commerce because if he hadn't raised them and hadn't eaten them he might have bought them from the trade and therefore someone in New Mexico would have sold him a gallon of beans, because these things *could* enter into interstate commerce. Let this be established so clearly that we and the members of the Congress will know that there is no such thing as intrastate commerce any more.

Now, I am not going to base this decision solely on this point because if there can be a definite decision of an issue or controversy between men without denouncing any act as unconstitutional it is better to put it on the other paragraph where one is present.

I am going to notice now for a moment the tendency of doing things under the so-called General Welfare Clause of the Constitution, art. 1, § 8, cl. 1.

In Curtis' Constitutional History, written a little over a century ago under the auspices of Daniel Webster, who was one of the great constitutional lawyers of the land, he definitely stated, as contended by counsel today, that the General Welfare Clause was not an affirmative provision of the Constitution authorizing any act whatever. What is the general welfare? I would daresay that the 30 tyrants of Athens thought they were acting in the general welfare of Athens.

I would daresay that the Imperial Caesars at times at least thought they, too, were acting for the general welfare.

General welfare is what we think it is and if you are doing what you believe to be the best, then you may be doing it for the general welfare. If we adopt general welfare as part of the Constitution authorizing us to act on laws we do away with the Bill of Rights. If you pass a law prohibiting the freedom of the press, and can get a judge to hold that it is in the interest of the general welfare, what becomes of that limitation in the Constitution? If you pass a law doing away with freedom of religion, and you can get a judge to hold that it is in the interest of general welfare, what becomes of that guarantee of the Constitution?

General welfare has no place as an affirmative part of the Constitution, any more than if we had said when we adopted the Constitution that the good

**340**

of the people shall be one of the moving purposes of the Congress.

When everything moves well, when the law is enforced and people prosper we have general welfare, and that is what the Constitution was talking about.

Not only does Mr. Curtis in his History of the Constitution say it, but so does Mr. Norton in a more modern treatment of the Constitution.

President Monroe takes the same view; so does Andrew Jackson.

■ The General Welfare Clause of the Constitution is not an affirmative part of the Constitution, and if it is then all of the balance of the document has gone by the board and we have a government of men and not a government of law.

■■ Coming now, then, to a third proposition: The government has not made a case against this defendant. It has charged him with violating the Agricultural Marketing Act. Take all of the exhibits that have been offered here, and what are they called? Marketing acts, they are not production acts. All he has violated is the rule against production. He marketed nothing; he sold nothing. He produced something and he fed it to his own livestock. As Justice White said, it might enter interstate commerce, but no one knows that the cows that ate the wheat entered interstate commerce. That which is produced is not commerce. No, not until it is made such.

What is commerce? Take your best text on the subject. We have copied one here: "Commerce strictly consists in the intercourse, including the terms and negotiations and transportation, like the transit of property and persons, as well as the purchase and the sale and the barter of commodities," citing In re Greene, C.C., 52 F. 104, 112, and other authorities.

Has this man had anything to do with commerce? Only in production. You have to extend the law to production in order to administer any punishment in this case.

" * * * But congress certainly has not the power or authority under the commerce clause, or any other provision of the constitution, to limit and restrict the right of corporations created by the states, or the citizens of the states, in the acquisition, control, and disposition of property. Neither can congress regulate or prescribe the price or prices at which such property, or the products thereof, shall be sold by the owner or owners, whether corporations or individuals. * * Commerce among the states, within the exclusive regulating power of congress, 'consists of intercourse and traffic between their citizens, and includes the transportation of persons and property, as well as the purchase, sale, and exchange of commodities.' " 52 F. 112, 113.

" * * * The word 'commerce,' as used in the statute and under the terms of the constitution, has, however, a broader meaning than the word 'trade.' Commerce among the states consists of intercourse and traffic between their citizens, and includes the transportation of persons and property, and the navigation of public waters for that purpose, as well as the purchase, sale, and exchange of commodities. County of Mobile v. Kimball, 102 U.S. 691 [697], 702, [26 L.Ed. 238]." In re Grand Jury, D.C., 62 F. 840, 841.

Moreover, a subject that was not discussed appealed to me. The farmer Clements who lived next to the defendant testified that defendant did plant wheat. He also testified that he had a farm and could plant 15 acres of wheat. "What do you plow with?" "With a tractor that cost $1,000; with a distributor that cost $750.00; with a reaper that cost $950.00," and what has he got to pay it back with? The profit of 15 acres of wheat.

We asked the first witness that testified in the case, Mr. Rainwater, "Can a man support his family, pay for his

equipment and own a farm under such regulations?" And I might say to the credit of the witness he agreed he could not, and the results are abundantly shown that he cannot. Just take the country over, in 1940 there was a census taken. In 1950 there was another census taken. This farm is in Oklahoma. Those farms have reduced in number considering that ten years, the population in the whole state of Oklahoma has decreased during those ten years by 4 per cent. Arkansas decreased nearly as much, North Dakota almost as much. Mississippi farm population decreased, and most of the agricultural states were able to hold their own by having some large industrial cities within their boundaries.

Not only with the other states, but let us come close to home. Let us walk over the line into Kaufman County, and what happens in Kaufman County, Texas? Between 1940 and 1950 the farm population decreased from 26,000 to 16,-000.

Well, go back to Red River and Lamar County. In 1940 the farm population was 31,000 and in 1950 it was 21,000. The farmers were gone.

In Navarro County the farm population in 1940 to 1950 shrank from 20,000 to 16,000.

In east Texas, the old settlement of Nacogdoches shrank in that ten years from 27,000 down to 17,000.

Cass County shrank from 33,000 down to 22,000.

It was offered in evidence here something on the trend since 1950, during the last seven years. This is compiled on the Texas farm population by the Texas Agricultural Experiment Station, at A & M College. According to estimate, based on a statewide survey conducted by the State Agricultural Experiment Station and the Agricultural Marketing Service of the United States Department of Agriculture, 1,018,000 people were living on farms in 1957. Just seven years previous the farm population was 1,387,000. Thus the number of farm

residents has decreased by 369,000 during seven years, or a decrease of 26 per cent-plus in these years. This in addition to loss between 1940 and 1950.

I can understand the vision that was in the mind of Goldsmith when he said:

"Ill fares the land where hastening ills prey; Where wealth accumulates and men decay. Princesses and lords may flourish or may fade, A breath may make them, a breath has made, But a bold yeomanry, a country's pride, When once destroyed can never be supplied."

Public policy—while not the intent of the Congress, the Agriculture Department has so construed its powers it has created a practice which is against public policy and is unlawful. A public policy which is injurious to the entire people is unlawful. You cannot perform a greater injury to the American citizenship than to destroy even in part the agricultural population.

Whichever way you may look the young man is not behind the plow. Before the regimentation of agriculture started he was, but now he can find better fields in industry, and the man that operates the farm has trouble in getting labor; he has to take the old man that industry won't use.

View it in another way; view it as Jefferson did when he advocated public education. He knew, as everybody knew, that when one man was to be taxed to educate another man's child, it was a socialistic idea, but it was justified, according to Jefferson, because it would insure the perpetuity of free government by reason of an intelligent suffrage; therefore, he felt it would be justified.

I sat at one time a few years ago with a very learned judge at a dinner table, and I regard him as one of the greatest jurists that ever graced the American bench. He asked me this question—he was discussing matters pertaining in part to elections, and he said, "We have a bloc who has one spokesman and that spokesman can cast 250,000 votes in the state, and that man can go to the head-

quarters of one political party and say, 'If we give you our 250,000 votes how many members of the Legislature will you give us?', or 'How many seats in Congress will you give us?', or 'How many contracts with profit in them may we have?', and after making the best bargain he can, then he goes over to the next one to get them to raise the ante, and when he has peddled his 250,000 votes back and forth the public pays for the transaction."

The more blocs, the more groups that can be voted, the greater danger to the nation. The most independent thinking group that America has ever had has been the middle class of American farmers.

We learn from the evidence in this case that the upper group of farmers, those who are able to farm on a large scale, will survive, but the middle class and the lower class are selling their farms and going away.

I am thinking about an old school history, of another nation, the great civilization of France:

"* * * peace prevailed; justice was impartially administered; industry flourished; the taxes were light; the towns practically possessed self-government; agriculture improved; * * *.

"But this age of prosperity was not to last. * * * The small farms were one by one bought up by wealthy men, who converted them into extensive cattle and sheep pastures tended by a few slaves. Thus the independent peasant population was gradually driven off the land, and agriculture declined. * * " The Leading Facts of French History by D. H. Montgomery, page 14.

"The law, in fact, regulated everything. A man could not set a price on his own goods; the government did it for him. These oppressions destroyed all public spirit and desire for life." Montgomery's History of France, page 16.

I consider the interpretation of the Act given by the Department of Agriculture as being against public policy and as destructive of a great branch of our civilization, the agricultural branch.

In many places more than half of them have been driven from their homes and their houses are vacant. Start here and drive through Denton County, and then down through Ellis County and back to Hunt County, and those prosperous blackland counties, and go down through Kaufman County, and get off of the highways and see how many vacant houses there are. We wonder where all the people in the cities come from, but if you will go out there you will stop wondering. Fully half of the population of the rural districts are now residing in the cities.

All of this shows that the regimentation of the farm and this managerial revolution and these practices which prevail are bad, and our Congress would do well to read the testimony of Mr. Benson; they would do well to read the record that has been made in this case, and then they should ask themselves if it is their purpose and their intention to wipe out entirely that provision of the Constitution that draws a distinction between interstate commerce and intrastate commerce, and to say that everything in the way of production is also commerce.

This man's only violation of any rule has been the violation of production and not of commerce. He has marketed nothing; he has sold nothing, and he has entered no where into the marts of commerce.

We will enter a judgment in favor of the defendant.