RUBBER TIRE WHEEL CO. v. MILWAUKEE RUBBER WORKS CO.

(Circuit Court, E. D. Wisconsin.    January 23, 1906.)

1. PATENTS—LICENSES—RIGHT TO ATTACH CONDITIONS.

It is within the rights of the owner of a patent to grant licenses conditioned that the licensees shall sell the patented article only at prices fixed by the agreement and also restricting the production of a licensee, and such agreements, if made in good faith and for the purpose of protecting the patent monopoly, are not illegal as in restraint of trade and commerce, and such good faith is not impeached by the fact that the patent has been held invalid by the federal courts in some circuits, where it has been sustained in others.

[Ed. Note.—Power of patentee to control his invention, see note to Heaton-Peninsular Button Fastener Co. v. Eureka Specialty Co., 25 C. C. A. 280.]

2. PATENTS—LICENSES—VALIDITY OF PROVISIONS—RESTRAINT OF TRADE.

Complainant, owner of a patent for a rubber tire which had been adjudged invalid by the Circuit Court of Appeals for the Sixth Circuit, entered into license contracts with all of the large manufacturers of tires in the United States, all of whom were engaged in interstate commerce. Such contracts were uniform, and each made a part thereof collateral contracts made at the same time, one of which was between complainant on one part and all of the licensees on the other. As a whole the contracts provided for the payment of a royalty equal to 4 per cent. of the net selling price of the tires made thereunder, fixed the prices at which the tires should be sold at a substantial advance over the then market price, and also limited the production of each licensee to a certain per cent. of the production of all, providing that if the licensee made less than his "quota" he should be paid a rebate of 20 per cent. on the value of the shortage, and if he made more he should pay a royalty of 20 per cent. on the excess. The contracts also provided for a board to supervise the operations of the licensees to which one-half the royalties should be paid and which should have power, with the consent of a majority of the licensees, to purchase tires from any of them and resell at such prices as it deemed for the interest of all. *Held*, that such contracts went beyond the rights of complainant under its patent monopoly in raising and maintaining prices in the states composing the Sixth federal circuit, in which the monopoly had no practical existence, and in creating a fund to be used to crush competition by outside manufacturers, as well in the Sixth circuit as elsewhere, and were illegal and void as creating a combination in restraint of interstate trade and commerce, in violation of the anti-trust act (Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200.])

Winkler, Flanders, Smith, Bottum & Fawsett and Augustine L. Humes, for plaintiff.

John F. Burke and Charles Quarles, for defendant.

SANBORN, District Judge.    Action at law to recover royalties under the Grant patent, No. 554,675, dated February 18, 1896, for rubber-tired wheels. The royalties claimed amount to $4,109.42; but, deducting certain offsets, the plaintiff, if entitled to recover, should have judgment for $2,517.66 principal, with 6 per cent. interest from the time the several amounts of royalties going to make up this sum became due, with due regard to the time of the payment of the sums making up the offsets. The defenses are that the license contract securing the royalties is denounced as illegal by the Sherman anti-

trust act (Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]), making void every contract combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce among the several states; also that the royalty contract is invalid under section 1791j of the Wisconsin Revised Statutes of 1898, prohibiting corporations organized under Wisconsin laws from entering into any combination, conspiracy, trust, pool, agreement, or contract intended to restrain or prevent competition in the supply or price of any article constituting a subject of trade or commerce in Wisconsin. Defendant is a Wisconsin corporation, and plaintiff an Ohio corporation. The reply to these defenses, in argument, is that they are immaterial, because the articles in question are patented, and the royalties claimed are under a patent monopoly; hence the license is neither within the Sherman act nor the Wisconsin trust act. In rebuttal to such anticipated reply, defendant pleads in its answer that the several agreements between the parties set out in the complaint were intended to form a combination in restraint of trade; that the patent mentioned in such agreements was void, and was believed by all the parties to the agreements to be void; that the patent had been so adjudged by the United States Circuit Court of Appeals for the Sixth Circuit, and the Supreme Court had refused to review that decision; that the patent was resorted to as a pretext merely to enable the contracting parties to evade the Sherman act and the Wisconsin statute, and the license contracts were not in fact, nor intended to be, license contracts under letters patent; but to create such unlawful combination; that by such contracts prices were raised beyond the natural and legitimate market prices, and the amount of manufactures restricted; and that the pretended license contracts were void under the Sherman act and the Wisconsin statute.

The three contracts pleaded and proved show a combination in restraint of trade and are in substance as follows: On October 10, 1903, plaintiff and defendant made the license agreement. It recites that plaintiff is the owner of the patent, and that defendant desires to obtain the right to manufacture, use, and sell vehicle tires made under the patent. Therefore it is agreed that plaintiff grants defendant such rights for one year, to the extent set forth in a "supplementary agreement" attached to the agreement of license, in the United States, except 19 states and certain counties and cities in other states. Three counties in Ohio are excepted from the grant. Plaintiff agrees to vigorously prosecute infringements, except such as may be committed in the Sixth federal circuit. Defendant agrees to pay a royalty of 4 per cent. of the net selling price of tires made under the license, and the further royalty of 20 per cent. over its "quota" fixed by the supplementary agreement. The supplementary agreement, of even date with the license, recites licenses like the foregoing to 17 other rubber-tire manufacturing companies, and fixes the quota which defendant shall manufacture each month during the license year at 2 per cent. in dollars and cents of the aggregate amount made and sold by all the licensees. The third agreement, made at the same time, called the "Licensees' Agreement," is between plaintiff as first

party and all the licensees as second parties. It recites the licenses, and that it is desired that the right of manufacture shall be exercised on uniform terms and conditions, and the operations of all the licensees supervised by an impartial administration. Therefore it is agreed that if any licensee shall sell more than its quota it will pay, in addition to the 4 per cent. royalty, 20 per cent. on the amount sold by it in excess of its quota; and, on the other hand, if it shall sell less than its quota, it shall be paid 20 per cent. on the shortage. Prices for first quality tires are fixed at 65 cents a pound, and for second quality 55 cents. Plaintiff agrees to employ a commission of five persons to supervise the operations of the licensees, and pay it one-half the royalties, or 2 per cent. If any licensee sells at less than the fixed prices it is to forfeit its right to license rebates under this contract. The licensees are to manufacture only two grades of tires. The commissioners may, by written consent of a majority of the licensees, purchase tires from any of them, and resell at such prices as they may deem for the interest of all the parties. These contracts most clearly make a combination within the Sherman act, if the subject-matter be within that act. That is the only question in the case.

The following facts appear in evidence: There has been considerable litigation over the patent. It was first sustained in Rubber Tire Wheel Co. v. Columbia Pneumatic Wagon Wheel Co., 91 Fed. 978, in the Circuit Court for the Southern District of New York, decided in December, 1898. In May, 1902, the patent was sustained by the Circuit Court for the Southern District of Ohio (unreported), but on appeal the Circuit Court of Appeals for the Sixth Circuit held it void as an aggregation of old devices. Goodyear Tire & Rubber Co. v. Rubber Tire Wheel Co., 116 Fed. 363, 53 C. C. A. 583, before Lurton, Day, and Severens, Circuit Judges. About the same time, in Consolidated Rubber Tire Wheel Co. v. Finlay Rubber Tire Co., 116 Fed. 629, in the Circuit Court for the Northern District of Georgia, Judge Newman sustained the patent, and also held defendant estopped to contest the validity of the patent. Before his opinion was published his attention was called to the Ohio case, but he declined to change his decision, as defendant was estopped. The patent was also declared valid in the Circuit Court of Appeals of the Republic of France, sitting at Paris. There is also an infringement suit now pending in the Southern District of New York, brought to stop infringement and also for the purpose of obtaining either an agreement in the various circuits as to the validity or invalidity of the patent, or such disagreement among them as will take the question to the Supreme Court. That court denied certiorari to review the Ohio decision. 187 U. S. 641, 23 Sup. Ct. 842, 47 L. Ed. 345. The Circuit Court of Appeals of the Sixth Circuit also held the patent invalid in Rubber Tire Wheel Co. v. Victor Rubber Tire Co., 123 Fed. 85, 59 C. C. A. 215, following the Goodyear Case. In the case now pending in New York, the witness Stapleton and several other attorneys represent the complainants, one of them being plaintiff here. Soon after the decision in Ohio, Mr. Stapleton advised plaintiff that the patent is valid, and so advised it in the early part of 1903. Similar advice was given

by Mr. John R. Bennett, an experienced patent lawyer in New York.

The opinion of Mr. Stapleton was based on the fact that the judges in three of the circuits had upheld the patent, and on his opinion that the Court of Appeals of the Sixth Circuit based its decision on wrong premises. The "tipping function" of the patented tire, hereafter described, the court held was not disclosed in the patent specifications. It was held that the specifications do not state how tightly or loosely the tire is to be applied to the wheel, so as to make this tipping function operative. Mr. Stapleton thinks the court was mistaken in this respect, and for that reason advised plaintiff that the patent will be sustained. It further appears in evidence that early in 1903, before the contracts in question were made, the rubber tire market was much demoralized. Prices were being cut by many manufacturers. After the combination was made the prices were maintained as fixed in the agreement, and it did away with all competition. Before the combination prices were 50 cents and 40 cents, respectively, and afterwards 65 and 55. After the expiration of the agreement the prices went back to the former rates. During the combination defendant made no effort to get any new business. All the tire manufacturers were in the pool except two small concerns. Defendant's tires were made in Wisconsin and sold in that and many other states.

The patent is for a specific combination of old devices. The chief ground on which it is sought to be sustained is that it produces a new and useful result, a new mode of operation, or an old result in a more advantageous way. The new result claimed is the neutralizing of side strain, from blows or friction, by what has been called the "side-tipping function," not found in the prior art. From the cut of a transverse section of the tire and felloe it will be seen that side pressure on the tire, if the retaining wires be not too tightly drawn, will cause the tire to rise on the side pressed, and tip on the other, rising in the channel and turning on the corner or angle of the opposite side, as upon a pivot, returning to its seat when the pressure is removed. Thus the strain is relieved, and both breaking and splitting prevented, as well as the cutting of the tire on the sloping flange or rim of the wheel. In the New York and Georgia cases this "tipping function" is held a novel and useful result, sufficient to sustain the patent. But in the Ohio case, while it is admitted that this feature, if present, might sustain the patent, yet that it is neither specified or claimed by the patentee. It is said by that court to depend on the proper tension of the retaining wires, and the specifications nowhere show how tight they shall be. Judge Lurton says:

"If this capacity for side movement be a beneficial function plainly inherent in Grant's combination and arrangement of old parts in relation to each other, and not a mere 'obscure property lurking in some accidental corner of his device,' it was not essential that the patentee should point it out as one of the advantages of his structure. This is because he has invented a machine, structure, or manufacture which includes in its necessary mode of operation the function in question, and, whether the inventor knew or not the full measure of the beneficial function of his structure, he is entitled to all the uses of his invention."

The court held that the tipping function was not plainly inherent in his very structure or device, because there is nothing to show how

tight the wires are to be stretched. The tipping capacity is not even pointed out, so that no mechanic, following the specifications, would know how tight or loose the wires were to be made. 116 Fed. 375, 376, 53 C. C. A. 583. On the other hand, Judge Newman, in the Georgia case, says that the shape of the tire—that is, the outward slant of the portion within the rim—its close fitting against the rim, and its angle below the edge of the rim, co-operate with the two-part wire fastenings to cause the rubber to rise, when exposed to extraordinary lateral force on one side, and turn on the angle of the other side, thus producing the tipping function and relieving the strain.

I have thus stated the question of patentability for its bearing on the belief and intent of the parties to this suit, their bona fide belief on the question of validity, and their resulting intent in making the licenses and licensees' agreement; in other words, in forming the tire trust. Mr. Stapleton, believing that the Court of Appeals of the Sixth Circuit missed the true construction of the specifications in respect to this new function, advised plaintiff, before the trust agreement was made, that the patent was, in his opinion, valid. Certainly it is entirely probable, as it seems clear to me, in view of such opinion so expressed, the opinion of Mr. Bennett, the character of the question itself, the fact that three Circuit Courts and the French court have sustained the patent, and the great success which the tires have been, in practical effect, that the parties to this suit, and to the licensees' agreement, may in good faith have believed in the validity of the patent. There is nothing in the character of the concrete, though narrow, question of patentability, as it seems to me, which rebuts the probability of such honest belief. It may well have been supposed, because the tipping function has an actual, practical existence in the tires built under the patent, that this feature, however obscurely, is included in the specified mode of operation, and that such novel and beneficial result would save the patent in the end, notwithstanding the Ohio decision. The Grant tires are wonderful preservers of carriages, old and new. If the "one-hoss shay" had been equipped with them it would, in my opinion, be running yet. It is at least possible that the courts will find in the patent specifications, by fair implication, a function which skilled workmen, all over the country, have actually found in them; and the owner and its licensees, though conscious that the patent had been to some extent discredited, and that its validity rested on narrow grounds, might yet have honestly believed that it would be finally sustained. At all events, bad faith has not been proved.

But, if it be assumed that the Ohio decision was the inducing cause of the combination, a more serious question is presented. Likewise, if the combination went beyond what was reasonably necessary to the enjoyment of the patent monopoly. It is impossible to restrain commerce in a thing which has no inherent commercial freedom. An existing monopoly cannot be monopolized. The patentee having brought forth the article from the world of mind, having added so much to the common stock of property, may do as he chooses with it. Singer v. Walmsley, Fed. Cas. No. 12,900. It is the patented machine or device itself, not merely the mental conception producing it, which

is protected from infringement. Any other rule would render the patent protection wholly illusory. Such protection extends to assignees and licensees equally with the patentee. It is not until the patented device has been sold and passed out of the dominion of the patent owner that the monopoly limit is reached. Adams v. Burke, 17 Wall. 453, 21 L. Ed. 700; Keeler v. Standard Folding Bed Co., 157 U. S. 659, 15 Sup. Ct. 738, 39 L. Ed. 848.

The Constitution, in the interests of invention, grants to the patentee the absolute right to exclude or debar the world from making, using and selling his device; and Congress by passing acts in aid of powers given it, like the power to regulate commerce, cannot interfere with this constitutional right of exclusion, embargo, or inhibition. Having the absolute power of complete exclusion, the proprietor may exclude, conditionally or in part, by imposing limits as to time, place, price, or persons. He may deal arbitrarily, may sell or withhold from sale, vend to one at one price and to another at a different price, permit use in one state and not in another, give reasons or not, or deal fairly or unfairly; and in doing all or any of these he is within his right, until the patent expires or is avoided, or the articles pass beyond the limits of his monopoly. He may even bring nonpatented articles within his monopoly by providing that the patented device shall be sold only in connection therewith. All this is so well settled, not only as to patents, but copyrights, secret process remedies, and trade secrets, that it is only necessary to refer to a few cases. Victor Talking Machine Co. v. The Fair, 123 Fed. 424, 61 C. C. A. 58; Bement v. National Harrow Co., 186 U. S. 70, 22 Sup. Ct. 747, 46 L. Ed. 1058; U. S. Consol. S. R. Co. v. Griffin & Skelley Co., 126 Fed. 364, 61 C. C. A. 334; Rupp-Wittgenfeld Co. v. Elliott, 131 Fed. 730, 65 C. C. A. 544; Dr. Miles Medical Co. v. Goldthwaite (C. C.) 133 Fed. 794; Board of Trade v. Christie Grain & Stock Co., 198 U. S. 236, 25 Sup. Ct. 637, 49 L. Ed. 1031. Like every kind of arbitrary power it is liable to abuse, but the power to abuse it resides in its very nature.

These observations apply only to patented articles which have not passed beyond the monopoly limit through sale by the patentee, licensee, or assignee. Here the monopoly ends. The articles are then in the same condition as if unpatented, subject to all trade and commerce regulations like any other property. See Adams v. Burke, 17 Wall. 453, 21 L. Ed. 700. Nor do such observations seem to apply to sale or manufacture in the states composing the Sixth federal circuit. It cannot be reasonably said that the proprietor has power to exclude or debar the use, sale, or manufacture in Ohio, Michigan, Kentucky, or Tennessee, since no court there will grant it an injunction, decree for infringement, or account, or judgment for damages. In those states the patent owner has no power at all, no dominion of market, no monopoly. It cannot, from a practical standpoint, accomplish a single one of the things mentioned which flow from its monopoly, simply because no remedy there exists. "Ubi jus, ibi remedium, et vice versa."

What the effect of a decision avoiding a patent for lack of novelty has upon the nine lives of a patent is a practical question, not a theoretical one. Suppose the same thing had happened to this patent as

occurred in the Driven Well Cases, 122 U. S. 40, 7 Sup. Ct. 1073, 30 L. Ed. 1064, and 123 U. S. 267, 8 Sup. Ct. 101, 31 L. Ed. 160; the patent being held void in one and valid in the other. If the Supreme Court in one case should hold the device anticipated, and in the other, for lack of evidence, sustain the patent, the effect would be to destroy the monopoly. True, the patent would still be presumptively good. The decision of the Supreme Court would not even be evidence against it. Pleading and proof would still have to show the prior art; and the patent might in a particular case be still sustained, even by the same high court which formerly avoided it. But from the practical standpoint the patent would be worthless. The owner would not have the presumption to attempt its enforcement. No Circuit Court in the country would afford him a particle of real protection. He would be helpless, the patent lifeless and despised, dead beyond the power of resurrection, no matter how useful the machines or devices made under it. Any attempt to revive such a patent and give it vitality would not only be futile, but would bring it and its proprietor into further contempt. But in the rest of the United States the Grant patent stands on different grounds. The Sixth Circuit decision would not afford the slightest evidence of its invalidity, however persuasive upon the court it might be. Not only this, but plaintiff believed it valid. Nor is there any evidence to show that the decision of the Sixth Circuit Court of Appeals was the inducing cause of the combination. I think it was due to the belief of all the parties that such a combination was within the rights of the plaintiff as owner of the patent. I do not find any evidence of bad faith on the part of either of the parties to this suit, or any of the licensees.

But the vital question, upon which I have had much difficulty, is whether the combination goes so much beyond the limits of the patent monopoly, and secures results so unnecessary to the patentee's rights, as to render the license agreements void. Do the restrictions of the license agreements add to the patent monopoly, or do they only keep up or continue the monopoly secured by the patent? The patentee having by his invention brought into existence the patented devices, they are not, in the usual sense, the subjects of monopoly. "A patent is that which brings out from the realm of mind something which never existed before and gives it to the country." Singer v. Walmsley, 1 Fish. Pat. Cas. 558, 22 Fed. Cas. 207. Monopoly restrains trade or commerce in articles which before were the subjects of trade or commerce. Patented articles were not so, for they did not exist before. Hence they cannot be the subjects of prohibited monopoly, unless the restriction be extended beyond what the patent secures. In re Greene (C. C.) 52 Fed. 104; Bement v. Harrow Co., 186 U. S. 70, 22 Sup. Ct. 747, 46 L. Ed. 1058; U. S. Cons. Seeded Raisin Co. v. Griffin & Skelley Co., 126 Fed. 365, 61 C. C. A. 334; National Phonograph Co. v. Schlegel, 128 Fed. 733, 64 C. C. A. 594. What, then, does the patent secure? What are the true limits of the lawful patent monopoly? Are the license agreements in their very nature illegal, because going beyond the patent domain, and employing restrictions not essential to fortify or sustain the patent right? As stated be-

fore, the patentee has the right of exclusion or inhibition against all others, in the making, use, and sale of the new devices he has invented and newly produced, and within this field his rights are unlimited. The license agreements do not attempt to limit total production, nor, apparently, the field of production or territory of sale. They do not restrict competition between the various licensees. They fix and control prices, and the quota of each manufacturer—provisions entirely lawful, and within the patent monopoly. They regulate the kinds of tires to be made, also permissible. They create a board of arbitration or administration, to enforce the performance by all the parties of the terms of their agreements, which would not be subject to criticism, unless designed to reach beyond the patent field, and secure results not granted by the patent laws.

But in two important ways the provisions of these contracts attempt to secure results not contained within or flowing from the lawful monopoly of the patent. First, they raise and maintain prices, and restrict trade and interstate commerce, in Michigan, Ohio, Kentucky, and Tennessee, where the patent monopoly has no practical existence; second, they create a fund for crushing competition in interstate commerce throughout the whole country, as well in the Sixth circuit as elsewhere, and not only competition in the Grant tires between outside manufacturers and those who are in the combination, but competition of all other rubber tires against the Grant tires. The arbitrators may, with the written consent of a majority of the licensees, purchase tires from them and sell at any price. They could thus, by selling at less than cost, stamp out and destroy competition against the licensees by independent makers of any kind of rubber tires. In these two ways the contracts do, in my opinion, secure illegitimate results, in their very nature unlawful, neither contained within nor essential to the patent monopoly. It is true, as the Supreme Court has decided, that agreements made to promote legitimate business under a patent, with no purpose to thereby restrain interstate commerce, are not within the anti-trust act, even if they do indirectly and remotely affect such commerce. United States v. Joint Traffic Ass'n, 171 U. S. 505, 568, 19 Sup. Ct. 25, 43 L. Ed. 259. Although I do not find in this case express unlawful intent, yet the necessary result being the restraint of interstate commerce in a prohibited field, not indirectly or remotely, but directly and substantially, it necessarily follows that the contracts were invalid, and that the suit must fail.

Within the proper domain of his monopoly the patentee may combine and conspire and restrict as much as he pleases. But I cannot conceive that enlightened courts, under a government of law, will find it consonant with just notions of duty to permit a patentee, however worthy his invention or large and extensive his rights, by means of his royalties to create a fund for crushing lawful opposition, destroying legitimate and proper competition, and restraining trade and commerce, not only in the patented articles themselves, but all others competing with them. Even in territory lawfully subject to his monopoly, I cannot believe this possible; still less in a broad do-

main covering four populous states in which the patent has become practically worthless—a territory greater in extent than that of the British Isles.

In view of the conclusion reached it is unnecessary to consider the effect of the trust act of Wisconsin. See, however, U. S. Consolidated Seeded Raisin Co. v. Griffin & Skelley Co., 126 Fed. 364, 61 C. C. A. 334; Columbia Wire Co. v. Freeman Wire Co. (C. C.) 71 Fed. 302.

Defendant's attorneys will prepare findings conforming to this opinion, and directing judgment dismissing the complaint, with costs.